Our next witness is Harry Kelley, counsel for the First Wave Plaintiffs, who are the appellants in this case. And I'm joined today by my colleague, Ron Whitaker. Your Honors, for almost 30 years, the First Wave Plaintiffs and the plaintiffs situated in the Court of Federal Claims matter have labored to demonstrate that the preservation statutes here caused compensable taking of their right to prepay their mortgages and to subsequently operate their properties as market rate rental properties. The only way that the Court of Federal Claims could have denied them their day in court is to adopt inflexible rules of law that we believe are inconsistent with the rules of this Court and with the Supreme Court, and on the basis of those per se rules made it impossible to consider the abundant factual record which we presented on summary judgment and which was available to the Court. There are a couple of per se rules that we want to point out that we think the Court erred in adopting. The first was that it made a determination that the takings in this case were permanent rather than temporary in nature. The second rule, and the consequence following from the first, was that the only way to prove a permanent taking was to consider the change in market value that resulted from the taking. And the third per se rule that we believe was an error was to determine that the claimant who acquired its property after the enactment of LIPRA, which is the statute that caused the taking in this particular case. Well, that's true for the Sucasa properties, isn't it? That's for the Sucasa property, Your Honor. And that means there was no reasonable expectation of prepaying because of the enactment of the statute. That's correct, Your Honor. And for the record, the Court did correctly conclude that for five of the six first-wave plaintiffs, they had demonstrated sufficient investment-backed expectations in order to prepay their mortgages. But with respect to the Sucasa property, we think that this rule is inconsistent with cases such as the Palazzolo decision from the Supreme Court and the more recent Muir case, both of which have held that the mere enactment of a statute does not thereby deprive a person who acquires property after the enactment of the necessary investment-backed expectations. Palazzolo said, for example, that if you follow that rule, you end up with a situation where nobody can assert a taking because the current owner prior to the acquisition of the property may not be in a position, as the owner in this situation was, to assert a claim because the taking had not occurred. But if the acquiring party is prohibited from asserting a taking claim, then essentially nobody can assert a taking claim. And the Court in Palazzolo said that essentially was working a terrific change in the nature of the property laws in this country. I seem to recall that the discussion by the Court of Federal Claims was a little bit more than just a per se rule. Wasn't there some deposition testimony or something that showed that Sucasa was aware of the fact that it would have some difficulty and that it would have to get HUD's approval in order to be able to sell the property? There was a lot of deposition testimony with respect to Sucasa. And I think most of it, if you, well, among other things, the general partner of Sucasa was a general partner of a number of other HUD-insured properties who had acquired those properties long prior to the enactment of LIPRA. He knew what was in these agreements. He knew what these agreements said. And he understood that essentially the mortgages read the same way and conveyed the same contract rights. But it's also clear that at the time Sucasa acquired its property in 1991, HUD had not issued its regulations. HUD didn't issue its regulations explaining what was actually going to happen until the following year in 1992. And the prepayment eligibility date was a year later in 1993. So I think that we would consider the owner of Sucasa to be a sophisticated investor but not clairvoyant. And this Court has previously said, and I believe it is the law of the case here in the Biafora case, that owners would have to come forward at the time that this Court was considering the issue of ripeness and introduce expert evidence with respect to the ability to prepay their mortgages. What about the holding of the claims court that you need to show fair market value, loss of fair market value, not just rental value? Well, we have not found a single case, Your Honor, in this Court or in the Supreme Court decision, and I don't believe the government has cited any such case either, that supports the proposition that the only way, if you assume that a permanent taking did take place there, that the only way to prove that a permanent taking occurred is by introducing evidence of fair market value. The cases on the contrary repeatedly cite U.S. v. Miller, for example, a good decision, says that there isn't a general formula that should be applied and that you really have to look at the nature of the alleged injury and tailor a measure of damages to the kind of injury that's being accrued here. And what our plaintiffs are looking at, what they lost, the right they lost was the use of their property. Previously this Court has described the taking of this case as the equivalent of a physical invasion of property. They were precluded from operating their property as market rate rentals, as they had intended to operate. So the question becomes, what is the correct measure of damages? And it seems to me that the correct measure of lost income is lost income. And that's what our experts conclude. The Court cited a Ninth Circuit case, Colony Cove and Independence Park, which I think is our case. Yes, Your Honor. And actually I think our analysis of Independence Park, the Court went on a great length looking at Independence Park, but our analysis of Independence Park we feel very strongly supports our approach. Because in Independence Park the Court said that the proper method for assessing damages suffered by plaintiffs in a similar situation is to start with the damages they would have been assessed for a permanent taking and then to reduce the amount by the value of whatever it was that they received. That's exactly what our expert did. He looked at the income that they would have received, and his report is quite lengthy and very voluminous, but it's meticulous in terms of— What about Colony Cove? Well, I think, Your Honor, we are concerned about the precedence in this Court. And I think that to the extent that, for example, this Court said in C-10 that there were two ways to look at the calculation of economic impact, one being change in fair market value, the other being— Is there a way for you to distinguish Colony Cove? It sounds like the answer is no. Except for the fact that it's a Ninth Circuit case. Well, it is a Ninth Circuit case, Your Honor. Anything else? Standing here this morning, Your Honor, I don't have an immediate response, but I'll consider that in connection with the reply. What about the Court's determination that your expert used the wrong denominator in his calculation of economic injury by looking at the equity? I don't think that there's an error in using equity because if you accept the basic validity of an income-based approach, which I think that, according to C-10, was a perfectly appropriate approach, then looking at issues such as the relationship between the anticipated income that they would have received over the remaining term of the mortgage and looking at the owner's equity was entirely appropriate. Can you break that down very carefully? Because we already said in C-10 a return on equity kind of analysis, as occurred there, would be no good. So you can't use return on equity. Well, what we did, Your Honor, I think, quite frankly, what C-10 said is it looked at the issue of equity in terms of the issue of the parcel as a whole. In C-10, it said that what the owners had done in that case was to, pardon me, what the expert had done in that case was to temporarily divide the owner's return and therefore break down rules with respect to the parcel as a whole there. Dr. Wade did not do that. He looked at the entire stream of income and then calculated, including an analysis, calculated as part of that lost income calculation what the owner's investment was. I don't think you can read it. Can I ask you, there's three different methods, it seems, disclosed in the report. Am I right in understanding that? I believe that the primary calculation was simply a numerical calculation of the total damages that these plaintiffs individually suffered. You take the rental income that they would have received without the regulation and subtract the rental income that they would have received with the regulation, both of them at present value. That's correct, Your Honor. And then the denominator that was used, what was the denominator that was used? It wasn't just equity, was it? No. It's not at page 3811. No, it wasn't, Your Honor. Essentially, he only used the equity as a way of essentially making sure that what he was looking at was the actual amount that an owner would have received through a market rate conversion versus what they did receive through the OLIPRA process. And those numbers were deducted, and so you ended up with two numbers that were then compared. Based on my limited understanding of Dr. Wade's formula, I don't understand why the equity amount was introduced into the formula. I mean, there's some razzle-dazzle notion that, well, what we're looking for is some kind of net present value. And so because we're looking for that, therefore we must back out the equity from the denominator. And, you know, obviously that results in shrinking the denominator in a way that thereby improves the plaintiff's presentation on how large of an impact this change in law was. But I don't understand logically why it's necessary to do that. Why can't you just figure out the amount of lost rental income due to this change in law, and then divide that by the amount of income you would have had if the change in law had never happened, and that's your percentage of economic injury, period. And, in fact, what I just described, as I understand it, is option number two I expressed in Sienega 10. Well, I think that Dr. Wood is trying to be very meticulous, and I believe what he was trying to do is to understand what was the net amount. That's the net present value is what his analysis looks at. And the formulas that were set forth in his report indicate that to get at that net value, to be able to have two numbers that you can really compare, that's why he deducted the equity. I assume for the moment we don't understand what he's talking about. And you're here serving as his translator, and you've got 40 seconds to tell us what is actually going on there. I think that is essentially, Your Honor, the answer. What he is doing is trying to resolve the number two numbers that can be compared. I have a very specific question for you. Do you mind looking at page A3811? I'm sorry, Your Honor? Do you mind looking at page A3811 of the record? I want to ask you a specific question about his formula, which is on that page. Thank you, Your Honor. So on page A3811, it does have economic loss equals. Do you see where I'm looking at? It has the number one in brackets to the right, and it says PV market conversion less TPE minus PV actual income less TPE. That's correct. So I think the first one, PV market conversion, is defined as the – that is – let me see. I think that's – had they actually not had the regulation in effect, minus PV actual income, what they actually got with the regulation in effect. Now here, see this on both of them? This is in the numerator of the formula. For each of those things, you've got less TPE. My question to you, and you might not know the answer, but my question is, when it says less TPE there, which is the amount of equity that the person has – or the owner has put into the property, is it the same for – is it the same number? Is TPE for the PV market conversion the same number as PV for actual outcome? I think they could be different, but I don't know. It's a fact of the matter, Your Honor. They are the same. Okay. And if you look at the subsequent charts that are presented here, you'll see that number coming out in both the with conversion and the without conversion number. And these were derived from the HUD-prepared LIPRA appraisals that were part of the record. So the introduction of equity into the formula has zero impact on the numerator? I believe that's correct, Your Honor. And I think that the actual comparisons, if you look at the tables that are later, several pages later, you'll see how he looked at – he removed the equity so that we were looking at the actual net outcomes for both the with restriction and the without restriction calculations. And that just gives you a net number, and then you look. The comparison becomes a comparison between the amount that they would have received with and the amount that they would have received without. Let me just try one more time. This is my third and last time. I'm sorry, Your Honor. Can you explain exactly why he has this need to back out the equity from the denominator? Because right now, what he's doing looks different from option 2 in Sienega 10. It's a modification to it. It's an obvious modification that results in a more inflated economic impact percentage. So I get that there's a motive to do it, but what's the justification for it? The justification, Your Honor, and I believe Dr. Wade was – I know Dr. Wade was not attempting to in any way manipulate the data. His attempt was to get at the question of what did they actually receive as a result of the LIPR process. And it is quite clear if you look at the Penn Central case. An owner is entitled to a reasonable rate of return. Penn Central says that over and over again. So he was trying to assess if you take out the equity, if you assume the owners got their equity back, what is the net number that they received under both scenarios? So this gives you the net present value. Yes. As opposed to the present value. That's right. And if you go back to page 8311, you'll see that the two formulas that he's expressing there are present value minus the TPE, or will and without. And then his second statement of that is the net value. And that's how he was referring to the net value. Do you think that is – again, this is probably a question for someone else other than us, but do you think that's a traditional or conventional way to calculate that present value? Absolutely, Your Honor. Dr. Wade's report is replete with references to that. And all I would say is that these are all excellent questions. These are the questions that should have been heard by the trial court so the trial court would have been able to resolve any questions of this kind that it may have had rather than essentially summarily deciding that his report was not sufficient. Marshall, you have well exceeded your time, but we've asked a lot of questions. We'll give you three minutes for rebuttal, but we'll hear from the government. Thank you, Your Honor. Ms. Rose. Thank you, Your Honors. May it please the Court. The Court of the Federal Claims should be affirmed here because the Court properly applied the law of this circuit and of the Supreme Court in finding that the evidence proffered by the plaintiffs was not sufficient to show economic injury. And regarding Su Casa there as well, the Court correctly determined that the plaintiff had not shown reasonable investment back to expectations. Starting with Su Casa, very briefly, there was no per se rule there. The Court considered the Supreme Court's rulings in Palazzolo as well as Muir, but what it found was that this was an arms-length transaction by a sophisticated purchaser who acknowledged that he followed the low-income housing statutes and was aware of LIPRA, including LIPRA's restriction, which was in the statute. You didn't need the regs for this on prepayment without approval from HUD. And there was no reasonable expectation for a buyer in that circumstance to expect that he would be able to sell the property and convert to market-rate housing. Where is the holding that only fair market value is probative evidence? I don't think that what the Court has held is that only fair market value is probative evidence. However, in order to show what Cienega 10 held, is that while there might be different ways to show the loss, it was bounded in important respects. It was bounded by the evaluation being based on the property as a whole. And then as well... On that second method in Cienega 10, what would be the government's view on what the denominator should be so that it's valued as a whole? It should be the total value of the property. Total value of the property or total value of the rental income that was lost? Well, the way that this can be thought of is that fair market value for income-generating properties, as this Court has recognized in decisions like first federal Lincoln and others, is that the fair market value of an income-generating property includes within it the anticipated income that the property would generate. So we don't have a problem necessarily with the use of a discounted cash flow model, and in fact the appraisals that were on the record here used discounted cash flow models. However, it has to be done based on the total value of the property, and it has to be done ex-ante. You have to use the information that would be available... I'm sorry, you're losing me a little bit. I can't tell if you're... Cienega 10 said there's two different ways that we measure economic impact. George Stoll was talking about way number two. You seem to be talking more about the first way. No, a discounted cash flow analysis can be used, but it still must be based on the total property value. So you would say that you would take the rental income that would have been received without the regulation, subtract out the rental income that would have been received with the regulation, and on your denominator you would have the fair market value... No, the total property value, not just equity. It would be based on total property value. But again... Wait, wait, what's total property value? Well, here the owners own the properties fee simple. They own the properties outright, so whatever the value of the property... It can't be done on a portion of the value. But the second piece that I want to... I'm sorry, we need to get this understood. Why wouldn't option two in SANIGA 10 be in the numerator the amount of rental income that would have been earned at market rates minus the amount of rental income that would have been earned under the LIPRA rates divided by the amount of rental income that would have been earned under the market rates? Why wouldn't that be the way to figure out the degree of economic impact under option two in SANIGA 10? It could be, Your Honor. However, the data that needs to be used would need to be done on an ex ante basis, standing in the shoes of a prospective buyer as of the date of the taking. And there's no dispute here that what Dr. Wade did was take data that postdated the taking by up to 20 years. And so in decisions like Olson, the Supreme Court has... Can I just make sure I'm following what you're saying? You're complaining about the fact that he discounted at the prepayment date? No, no, discounting is entirely appropriate. What Dr. Wade did was to use data from 2011, 2012, to build his calculation of value. But the Supreme Court has been very clear, and I think this court has been clear, that when you're valuing a taking, you do it on an ex ante basis, standing in the shoes of what a reasonable buyer or seller would have known at the time of the taking. And so again, done properly, a change in value assessment and a change in income assessment should yield the same result. Because again, for income generating properties, market value is routinely developed using discounted cash flow analysis. So there's no problem using a discounted cash flow analysis. The problem becomes when you're not using data that was known at the time of the taking. The Supreme Court in cases like Olson has been clear that just compensation should involve all of the factors that give value to the property, but it doesn't exceed the market value fairly determined. You're saying you can't use actual future data in order to speculate as to what somebody knew at the time of the taking. Right, because you're not... What's your best case for that position? I would say that the Supreme Court's decision in Olson makes that point very clearly, that you don't use anything that postdates the date of the taking in determining value. Are you aware of any cases where a court has actually gone beyond that and considered actual data that postdated the taking in order to calculate the value? I mean, sometimes what actually happens is what was predicted. Well, it could be, but what the Federal Circuit... It seems surprising to me that there would be such a per se rule. I'm sorry. It seems surprising to me. It's best not to talk over the judge. I apologize. And so I'm wondering if you know of any cases that would violate this per se rule. Again, it's not a per se rule, but the only case that I'm aware of in which the Supreme Court has talked about using data that postdate the time of the alleged taking is a case cited by plaintiff. However, there, that was the Westinghouse electric case. There, the Supreme Court wasn't looking at ex post data to determine the market rental value. It was only looking at removal costs. So I don't think that that's comparable here. And as this court recognized in Roseacre 6, when the Supreme Court has talked about value in taking cases, it has focused almost exclusively on market value and not on lost profits, which is what plaintiffs were trying to do here. And the decision of the court in Siena Gaten reinforces that the court did not have in mind a method of calculating compensation that would exceed fair market value. If you look at the footnote in footnote 13, it says, we note, however, that the Court of Federal Claims awarded Chancellor Manor $10.5 million in damages, significantly more than the property's appraised value of $7 million. Logically speaking, the government cannot take more than what the plaintiffs actually possess. So market value does have a binding effect. Market value determined on an ex ante basis. We're not saying that there couldn't be other ways to bring this in, but at the end of the day, it is the plaintiff's burden to present evidence that allows the court to compare what was taken with what remained. Can I ask you another question, which is, as I understand it, this severe economic injury prong isn't necessarily a measure of the damages that would later be awarded. That could be something different. This is just to see, hey, has the taking, this regulatory taking, been significant enough that we're going to continue the analysis? Is that correct? Well, I think that that is not correct in the sense that it would allow a plaintiff to clear the hurdle of summary judgment without showing how the alleged taking affected the value of the property. I was just asking if the analysis here is different, if this prong, economic harm, is different than an analysis in a takings case of the actual damages after it's already been established that there's been a taking. That's all my question is. There could be in some circumstances. Here, there would not be. And I believe that Dr. Wade has a portion of his opinion where he states that he believes that the just compensation is essentially equal to his calculations on economic impact. Just again, very, very, well, we recognize that this court in Sienega discussed two ways in which this could be evaluated. And then in CCA, we reinforced that, right? We said Sienega 10 is the way to go. We're bound by Sienega 10. Yes. Again, however, when those calculations are done correctly, there will be two sides of the same coin, and they shouldn't result in wildly different numbers, which is what Plaintiff's expert has done here. And going back to that point in footnote 13 in Sienega 10, the court correctly noted that Dr. Wade's calculations resulted in alleged lost value just of the property right that exceeded fair market value, the entire fair market value of the property for three of the properties. So, for example, as she used Duffman Gardens as an example, the total appraised value of the property was, the total appraised value, I don't remember the exact number, but it was under $7 million. And Dr. Wade calculated the loss of the lost property interest as $9 million. So he said that it exceeded the total value of the property by more than $2 million. Is that $9 million based on the difference between the expected income at market rates versus the expected income under LIBRA rates? Yes, it's based on his net present value calculations, which, again, are based on ex post data. As there's no dispute here that he folded in ex post data. Did the claims court say anything about ex post data? She did not reach that, but she did not need to. She correctly determined that these should be analyzed as permanent takings because, again, LIBRA was a statute where Congress, and this court has recognized this in Sienega, was balancing the needs of the low income housing against the... There's nothing in Sienega 10 that limits the use of either of those two ways, right? I would disagree with that because Sienega 10 says that the opportunity for a fair market value sell precludes the finding of a taking. And it's an interesting evolution of plaintiff's positions here because in Sienega 10 the plaintiffs actually agreed with that point. But here you had five plaintiffs who took advantage of LIBRA's opportunity... I thought you argued below it doesn't matter whether this is regarded as a temporary or permanent taking. It doesn't, but the just compensation cannot exceed the fair market value on the... But isn't also, I understand your point that you're making about the compensation being larger than the fair market value, but I also note that Dr. Wade, didn't he challenge the validity of HUD's fair market value appraisal? So that means that maybe, you know, they'll try to show that it's a different amount and so that ratio you're talking about might be different. I mean, we're not supposed to sit here and say, oh yeah, that's good enough of a reason to automatically assume that Dr. Wade's testimony is per se wrong. I mean, he's challenged HUD's fair market value. He's only challenged them based on, not by presenting an alternative calculation of what he thinks that fair market value should have been as of the date of the alleged taking. He's only taken issue with whether or not the process could yield a fair market value assessment. But here, as the court recognized in Sienega, the fair market value sale option was given to plaintiffs at the highest and best use of the property with the prepayment right intact. So assuming that an owner would be able to immediately convert to market rate housing or to develop the property as condominiums, there was no restriction on the fair market value under the LIPRA sale option, and it was determined by at least two independent appraisers, one of which was selected by the property owners. Here, there's no evidence presented by plaintiffs, and they won't be able to point to any that shows that those calculations were incorrect. And if they had put forward evidence that showed that the fair market values that were calculated under the LIPRA sale process did not fully capture the fair market value as of the date of the alleged taking... You're almost out of time, and I'd like to just try to stick to the analyses the court below actually relied on, rather than these extraneous things. What about the court below also said something about Dr. Wade's model being flawed because he relied on the return on equity theory? Could you talk a little bit about that and your understanding of what Dr. Wade actually did? Right. So Dr. Wade, he benchmarked. That's what he calls it. Instead of using the term denominator, he benchmarked his calculations to equity. And as the court found, there is no way to translate what he's done into usable data for the court to determine whether or not there's been economic harm here. Is that true even for... I think that might be true for at least one of his methods, but for the method on page A3811 of the record, I don't see that, that equity is the sole thing in the denominator. And so I want to know your response to that. Well, for all of his calculations, they are benchmarked to the transfer preservation equity, but we also, the court had questions for plaintiffs about why these cash flows of the transfer preservation equity were removed. And he, Dr. Wade, isn't doing just the type of income analysis that... So I'm going to make sure I understand your answer. Your answer is that you think that the formula used by, and the method used by Dr. Wade at page 3811 has equity only as the denominator. Is that correct? No. However, it is not the method that the court contemplated in Sandicott 10 for two reasons. First of all... But that's an issue for the court below, right? I mean, your argument, the court below said that the denominator in all was equity, right? That it's benchmarked to equity, right? And you're disagreeing with that, at least for the method at page A3811, right? Um... This, what is shown here on 3811 does not comport with what this court said was an available method under Sienega 10, and there are two ways in which this deviates. First of all, the court, when they were looking at using lost income, there was no taking out of the transfer preservation equity. But again, under holdings of this court and Sienega and other decisions and the Supreme Court, the loss that a plaintiff suffers as an alleged taking cannot exceed the market value fairly determined. And Dr. Wade is brazen about not adhering to that. He does not consider himself bound by that at all. The reason that... Please finish your thought, counsel. Your time has expired. In short, Your Honor, the plaintiff must present evidence that permits the court to compare the value of the property on the date of the alleged taking with and without the restriction. And while different evidence might be used, the evidence must be bounded by the fair market value fairly determined as of the date of the alleged taking, and it must be based on the total property value. Thank you, counsel. Mr. Kelly, three minutes. Thank you, Your Honor. I'd like to begin by apologizing to Judge Chen with respect to the colony cope decision, which, when you posed your question, I perhaps did not understand it. As I read the colony cope decision, the United Circuit said that sale value there is not the only permissible basis to consider economic loss. The court agreed that discounted future cash flows produced by an income-producing property can provide an appropriate valuation methodology. In that instance, the court said that the plaintiffs had not produced evidence of that kind. And so I believe that colony cope is essentially consistent with the position that we've taken. With respect to the final points I'd like to make here today, listening to the government's argument, it appears the government's now acknowledging that, in fact, if this were a permanent taking, that there is, in fact, more than one way to calculate economic loss, that fair market value was not the only possible alternative and something else was allowed. If that is the case, then we really do need to send this case back to the Court of Federal Claims, because that was not what the judge concluded. She said the only way to do this was fair market value. And essentially she threw out and concluded Dr. Wade's analysis was unhelpful because it didn't address fair market value. So by getting off on that wrong step, I believe the Court of Federal Claims made a series of cascading errors that led to the opinion and the conclusion that she reached. So I think that there is very strong reason to return this case to the Court of Federal Claims. On the issue of appraisals, I just want to point out that, in my mind, an appraisal, if you're trying to get at the issue of lost income, an appraisal is an extreme and changes in property value as evidenced by an appraisal. An appraisal is a very foggy proxy for the loss that we are claiming here. There are a lot of other factors besides income that are included in an appraisal. Comparable properties, other factors that may influence the decision of what a property is worth. They have absolutely nothing to do with the Lipner mechanism. And we did, in fact, dispute those matters. Our witnesses did introduce testimony. It is in the record. It's even cited on footnote 12 of the Court of Federal Claims' opinion, where she acknowledges that Dr. Wade disputed components of the appraisals as a valid measure. Again, that's a fact question. That should have been decided at trial by the Court of Federal Claims. On this issue about ex post and ex ante information, the Court of Federal Claims didn't think it was important enough to even address. I will simply say that our position is that the Sinclair refining case makes it very clear that when we are now 30 years almost from the effective date of the taking, there's a book of wisdom. There's knowledge that we have gained. And to contend that we all who are litigating these cases must constrain ourselves to the data which was available only at the time when the taking occurred is not required by the Court. I conclude by saying, Your Honors, as I began, these plaintiffs have waited decades, decades to have their day in court. They presented evidence and legal arguments to support their claims that are completely consistent with the controlling precedents of this Court and more than sufficient to survive summary judgment. We believe the Court of Federal Claims in many respects acted improperly, and we've presented absolutely abundant evidence that they suffered a severe economic injury as a result of their taking. After almost 30 years, please give them their day in court.  Thank you, Your Honor.